**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - -X
LADELE KENNEDY,                          :
                    Petitioner,          :
                                         :
    -against-                            :    **OPINION & ORDER**
                                         :    05 Civ. 1955 (JFK)
BRIAN FISHER, Superintendent, Sing Sing  :
Correctional Facility, and               :
ELLIOT SPITZER,                          :
Attorney General of New York State       :
                                         :
                    Respondents.         :
- - - - - - - - - - - - - - - - - - - - - -X
**JOHN F. KEENAN, United States District Judge:**

        Petitioner Ladele Kennedy ("Kennedy"), through counsel,
brings this petition for a writ of habeas corpus, pursuant to 28
U.S.C. § 2254, challenging his state court conviction of one
count of murder in the second degree (N.Y. Penal Law §
125.25[1]), on the sole ground that he received ineffective
assistance of counsel.  For the reasons set forth below, the
petition is denied.

**BACKGROUND**

        On September 14, 1998, Kennedy, a 17-year old member of
the Bloods street gang, shot and killed Kedwar Ademuyina outside
Mr. Ademuyina's home at 1818 Anthony Avenue, in the Bronx.  On
October 13, 1998, Kennedy was charged by Indictment Number
6828/98 with the crimes of Murder in the Second Degree,
Manslaughter in the First Degree, Criminal Use of a Firearm in
the First Degree, and Criminal Possession of a Weapon in the

1

Second Degree.  After a jury trial in New York State Supreme Court, Bronx County (Moore, J.), Kennedy was convicted of Murder in the Second Degree and sentenced to a term of imprisonment of 25 years to life.

The following facts, relevant to the instant petition, were adduced at trial.

Kennedy, Clint Brundage ("Brundage"), and Emmett Middleton ("Middleton") were members of the Bloods, a well-known gang.  On the afternoon of September 14, 1998, Brundage left his school and went to the home of his friend LaLa, who was also a member of the Bloods.  Brundage told LaLa that he had a dispute with the Latin Kings, a rival gang.  LaLa gave Brundage a revolver loaded with a single bullet.  Brundage placed the gun in his knapsack and went home.  Later that afternoon, Brundage met Kennedy at the home of Dimples, Kennedy's girlfriend.  Brundage showed Kennedy the gun.  Kennedy examined the gun, repositioned the gun's cylinder so that the next time the trigger was pulled the single bullet would be fired, and placed the gun back in Brundage's bag.  Kennedy and Brundage then left Dimples' home and walked to a nearby schoolyard.  There, Kennedy told Brundage that he wanted to "catch a vic" and that he "might as well get that cat" who lived on the same block as Middleton. (Tr. 206.)[1] According to Brundage and Middleton, Kennedy was referring to Mr.

_____

[1]"Tr" refers to the trial transcript.

2

Ademuyina, an African man who lived at 1818 Anthony Avenue, on the same street where Middleton lived.  After first telling Brundage that Kennedy was going to rob Mr. Ademuyina, Kennedy then said, "Nah. . . I might as well kill him."  (Tr. 209.) Brundage also testified that, prior to September 14, 1998, he and Kennedy had had several conversations during which Kennedy had professed a desire to kill Mr. Ademuyina in order to obtain a higher rank within the Bloods.

The testimony of Brundage and Eddie Graham, an officer with the Department of Corrections and an expert in the operations of the Bloods, established that a member of the Bloods could achieve greater status within the gang by killing a non-gang member.  Such a killing would result in promotion only if the victim first had shown disrespect to the Bloods.  In addition, if a gang member used a gun to kill a non-gang member, the gun could contain only one bullet, or the killing would not count towards promotion.

After speaking in the schoolyard, Kennedy and Brundage rode a bicycle to Middleton's residence at 1848 Anthony Avenue. Upon arriving at that address, they sat on a parked car outside Middleton's building.  At one point, they saw Mr. Ademuyina walking toward them on the sidewalk.  As Mr. Ademuyina was passing, Brundage hit him with a broken windshield wiper. Brundage testified that he did so in order to provoke Mr.

Ademuyina into disrespecting the Bloods and thereby provide cause for Kennedy to kill a non-gang member. After being hit by the windshield wiper, Mr. Ademuyina stopped and demanded to know who had thrown the object. Kennedy denied having done it and then asked Brundage to hand him the gun that was in Brundage's knapsack. Mr. Ademuyina then said, "Forget this" and continued walking toward his residence at 1818 Anthony Avenue, which was located approximately one block from the parked car where Kennedy and Brundage had been sitting. (Tr. 222.) Kennedy then pulled out the revolver from Brundage's knapsack, placed the revolver in his waistband, and told Brundage to follow him. Brundage grabbed a broken table leg from the street, and Brundage and Kennedy proceeded to follow Mr. Ademuyina. As Kennedy and Brundage followed Mr. Ademuyina, Middleton came riding his bicycle down the street towards them. Kennedy and Brundage called out to Middleton to follow them, and Middleton, on his bicycle, followed Kennedy and Brundage. As Mr. Ademuyina opened the front door of his building and began to enter the lobby, Kennedy aimed the gun at Mr. Ademuyina and, from a distance of approximately four feet, fired a single shot. The bullet struck Mr. Ademuyina on the right side of his back. Mr. Ademuyina turned and faced Kennedy, Middleton, and Brundage. Brundage then hit Mr. Ademuyina with the broken table leg, causing him to fall. Kennedy, Middleton and Brundage then fled. Police arrived and took Mr. Ademuyina to

-4-

the hospital, where he died as a result of the single gunshot
wound.

The testimony of Albert Whitfield, a resident of Mr.
Ademuyina's building, partially corroborated the accounts of the
shooting provided by Brundage and Middelton.  Whitfield testified
that he was looking out the window of his seventh-floor apartment
when the shooting ocurred.  Whitfield saw two young black males
on foot, the shorter of them carrying a stick, and one young
black male on a bicycle follow Mr. Ademuyina to the building
entrance.[2]  Whitfield lost sight of the three males and Mr.
Ademiyuna as they approached the building entrance but heard the
gunshot.

On September 16, 1998, police arrested Middleton in
connection with the shooting.  Middleton told police about
Kennedy's and Brundage's roles in the killing.  Police then
arrested Kennedy and Brundage.  Following his arrest, Kennedy
submitted a written statement, in which he confessed to the
shooting but did not mention his affiliation with the Bloods, any
prior conversations with Brundage regarding promotion within the
Bloods, or the existence of any plan to kill Mr. Ademuyina.
Rather, in his statement, Kennedy characterized the shooting as
an accident, following a verbal confrontation with Mr. Ademuyina.

---

[2]It was established at trial that Brundage was shorter than
Kennedy.

Specifically, Kennedy stated that, when he and Brundage were sitting on a parked car in front of 1848 Anthony Avenue

> . . . an African man passed by me and then turned around and asked me who threw that. I said, I don't know. You're talking to the wrong person. Then he walked away and came back and had his hands in his right pocket, and said, what. I guess he thought I said something. That's when Clint [Brundage] went behind the car and got a black bag. The African told him pull out what you got. Clint handed me the gun, and said there ain't anything in there. We followed the African to his building. He was putting the key into the door so he could get in when he turned around and said something which I don't understand and then the gun went off. I didn't even know I shot him. I just turned around and walked away.

(Tr. 106-07.)

Later, Kennedy made a videotaped statement, in which he described the killing in substantially the same manner. Specifically, Kennedy stated in the videotaped interview that Brundage gave Kennedy the revolver; that Brundage told Kennedy that it was not loaded; and that the revolver "went off." (Tr. 80-81.) Both the written statement and the videotaped interview were admitted into evidence.

After his arrest, and while incarcerated, Kennedy wrote a letter to Brundage, who was also incarcerated. In the letter, which was introduced into evidence, Kennedy told Brundage that his status within the Bloods had, in fact, increased after the shooting of Mr. Ademuyina. The letter was introduced into evidence.

Following their arrests, Brundage and Middleton also provided written and videotaped statements to the police.

-6-

Brundage was charged with second degree murder in connection with the shooting of Mr. Ademuyina.  Pursuant to a plea agreement with the Bronx District Attorney's Office, in exchange for his truthful testimony at Kennedy's trial, Brundage's homicide case and a pending unrelated robbery charge were to be transferred to family court.  The prosecution also promised to recommend to the family court judge that Brundage receive a sentence of time served for the pending cases.  Middleton was released from custody after he provided testimony at the Grand Jury. Thereafter, the case against Middleton was dismissed.

        The defense presented only one witness, Detective Freddie Mendoza, who testified regarding the physical descriptions of the assailants that Whitfield provided to Mendoza after the shooting.

        In summation, Kennedy's trial counsel, Michael Torres ("Torres") assailed the credibility of both Brundage and Middleton.  Torres pointed out various inconsistencies between Brundage's and Middleton's post-arrest statements to police and their trial testimony, including the fact that, in contrast to their testimony at trial, Brundage's and Middleton's post-arrest statements contained no mention of Kennedy's statements regarding his plan to shoot Mr. Ademuyina in order to advance within the Bloods.  Torres also observed that Brundage had received a highly favorable plea deal in exchange for his

testimony and that charges against Middleton had been dismissed
following Middleton's testimony before the Grand Jury.

Torres argued that, contrary to the trial testimony of
Brundage and Middleton, the shooting was not the result of
Kennedy's attempt to gain status within the Bloods. Rather,
Torres argued that the revolver accidentally discharged and
Kennedy had no intent to shoot Mr. Ademuyina.  As Torres stated:

> TORRES:   It all goes down to this issue of intent.
> Intent.  Ladele Kennedy's position is clear.
> That he had no intent not even to fire the
> weapon.  That it just went off and if you
> believe that then certainly he is not guilty of
> Murder in the Second Degree or Manslaughter and
> he did admit the gun.  You have to determine
> when you saw him on the video when he said that
> he had the gun and it went off that he had no
> intent to fire it, whether he was being
> truthful and whether the People have failed to
> prove beyond a reasonable doubt that that is
> so.

(Tr. 1249.)

Torres conceded that Kennedy possessed the revolver and
addressed the jury with possible different intentions that
Kennedy may have had in approaching Mr. Ademuyina with the
weapon:  "[Y]ou can fire a weapon and intend to kill someone.
You can fire a weapon and intend to hurt someone.  You can intend
to injure someone or scare someone." (Tr. 1250.)

Torres also pointed to the fact that Kennedy shot the
victim in his back near the shoulder, rather than in the head or
heart, as indicative of the accidental nature of the shooting.
As Torres argued, "there is nothing, nothing about the injury

itself to suggest intent to kill." (Tr. 1252.)

At the charge conference, Torres requested that the court charge criminal possession of a weapon in the third degree as a lesser included offense of criminal possession of a weapon in the second degree.  The court denied the request.  Torres, however, did not request that the court submit to the jury the charges of manslaughter in the second degree or criminally negligent homicide as lesser included offenses of second degree murder.  The court thus instructed the jury to consider the charges of murder in the second degree, manslaughter in the first degree, or criminal possession of a weapon in the second degree.

The jury found Kennedy guilty of murder in the second degree.

On March 7, 2000, Kennedy was sentenced to a term of imprisonment of 25 years to life.  Kennedy took his direct appeal to the Appellate Division, First Department, on grounds that did not include ineffective assistance of counsel and that are not relevant to the instant petition.  On May 28, 2002, the Appellate Division, First Department, unanimously affirmed the conviction. People v. Kennedy, 284 A.D.2d 283 (1st Dep't 2002).  On July 23, 2002, the New York Court of Appeals denied Kennedy leave to appeal.  People v. Kennedy, 98 N.Y.2d 698 (2002).

While the direct appeal was pending, on June 17, 2002, Kennedy moved in the trial court to vacate the judgment of

conviction pursuant to New York C.P.L. § 440.10(1)(h) ("440.10 Motion"), on the ground that his trial attorney had denied him effective assistance of counsel by failing to request that the court instruct the jury on the lesser included offenses of manslaughter in the second degree or criminally negligent homicide.  The motion was supported by an attached affirmation from Torres, in which Torres stated as follows:

> Mr. Kennedy was convicted of murder in the second degree on March 7, 2000, in connection with the shooting death of Kedwar Ademuyina.  At trial, the jury was instructed to consider three counts, all of which were contained in the indictment:  murder in the second degree, manslaughter in the first degree or criminal possession of a weapon in the second degree.  The court denied my request to submit the lesser included offense of criminal possession of a weapon in the third degree.  I did not request submission of criminally negligent homicide and/or manslaughter in the second degree.  I do not recall weighing the option of asking the Court to present these lesser included offenses.  To the best of my recollection, I believe that my failure to request these lesser offenses was not a tactical decision.  Rather, my belief is that, in all probability, I simply overlooked the possibility of seeking these lesser offenses, and therefore, the failure to request them was not done for strategic reasons.

(Pet. Mem., 11.)

On January 2, 2003, Justice Moore denied the motion without a hearing.  People v. Kennedy, Ind. No. 6828/1998 (N.Y. Sup. Ct. Jan. 2, 2003).  The trial court reviewed counsel's overall performance during the trial and held that "notwithstanding counsel's failure to request the lesser included offenses, trial counsel provided meaningful representation." Id. at 6-7.  On February 27, 2003, the Appellate Division, First

-10-

Department, granted leave to appeal.  On May 6, 2004, the
Appellate Division affirmed the trial court's denial of Kennedy's
motion to vacate his conviction. People v. Kennedy, 7 A.D.3d 272
(1ˢᵗ Dep't 2004).  The Appellate Division held that, even if
Torres' omission was not a strategic decision, the omission did
not affect the outcome of Kennedy's trial.  Id.  On August 9,
2004, the Court of Appeals denied Kennedy's motion for leave to
appeal. People v. Kennedy, 3 N.Y.3d 6767 (2004).  This petition
for habeas relief followed.

## LEGAL STANDARD

The Anti-Terrorism and Effective Death Penalty Act
("AEDPA") provides the applicable standard of review of § 2254
habeas cases. See 28 U.S.C. § 2254 (2004).  AEDPA provides, in
relevant part, that a habeas petition may not be granted to a
state prisoner unless the state court's adjudication of the claim
on the merits "resulted in a decision that was contrary to, or
involved an unreasonable application of clearly established
Federal law, as determined by the Supreme Court of the United
States." 28 U.S.C. § 2254(d)(1); see also Williams v. Taylor, 529
U.S. 362, 386 (2000); Sacco v. Cooksey, 214 F.3d 270, 273 (2d
Cir. 2000).

For purposes of this court's review of Kennedy's claim
of ineffective assistance of counsel, the rule set forth in
Strickland v. Washington, 466 U.S. 668 (1984), is "clearly

-11-

established Federal law, as determined by the Supreme Court of
the United States." <u>Williams</u>, 529 U.S. at 391.  <u>Strickland</u>
requires that, in order to prevail on an ineffective assistance
of counsel claim, a petitioner must demonstrate that (a) his
counsel's performance "fell below an objective standard of
reasonableness" and (b) there is a "reasonable probability that,
but for counsel's unprofessional errors, the result of the
proceeding would have been different." <u>Strickland</u>, 466 U.S. at
688.  Reasonable probability means a "probability sufficient to
undermine the confidence in the outcome." <u>Id.</u> at 694.

        Under AEDPA, Kennedy "'must do more than show that he
would have satisfied Strickland's test if his claim were being
analyzed in the first instance, because under § 2254(d)(1), it is
not enough to convince a federal habeas court that, in its
independent judgment, the state court applied Strickland
incorrectly.  Rather, he must show that the [state court] applied
Strickland to the facts of his case in an objectively
unreasonable manner.'" <u>Cox v. Donnelly</u>, 387 F.3d 193, 197 (2d
Cir. 2004) (quoting <u>Bell v. Cone</u>, 535 U.S. 685, 698-99 (2002)).
In deciding whether the state court unreasonably applied
<u>Strickland</u>, a federal district court is "to apply [a standard
that] falls somewhere between 'merely erroneous and unreasonable
to all reasonable jurists.'" <u>Jones v. Stinson</u>, 229 F.3d 112, 119
(2d Cir. 2000)(quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 109 (2d

-12-

Cir. 2000)).  As the Second Circuit has noted, "the <u>Strickland</u>
standard is rigorous, and the great majority of habeas petitions
that allege constitutionally ineffective counsel founder on that
standard." <u>Lindstadt v. Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001).

## DISCUSSION

Kennedy claims that his counsel was constitutionally
ineffective for failing to request that the trial court instruct
the jury to consider the lesser included offenses of manslaughter
in the second degree or criminally negligent homicide and that
the state court unreasonably applied <u>Strickland</u> in concluding
that Kennedy was not deprived of effective assistance of counsel.
Petitioner argues, in essence, that (a) Torres' failure to
request the charge on the lesser included offenses was not part
of reasonable trial strategy, as Torres admitted in his
affirmation, and amounted to deficient performance under
<u>Strickland</u>; and (b) the deficient performance prejudiced Kennedy
because, absent the submission of charges on the lesser included
offenses, the jury had no opportunity to return an appropriate
verdict in the event that it credited Torres' argument that the
shooting of Mr. Ademuyina was an accident.

Respondents contend that (a) by not requesting that the
trial court submit lesser included offenses to the jury, Torres
was mounting an "all or nothing" defense and therefore pursuing a
reasonable trial strategy;  and (b) in any event, the omission

did not result in prejudice to Kennedy.

The Appellate Division reviewed the merits of Kennedy's ineffective assistance of counsel claim and affirmed the trial court's denial of Kennedy's 440.10 Motion on the ground that, even if Torres' omission amounted to deficient performance, the deficiency did not result in prejudice to Kennedy.  In reviewing the state court's holding regarding the prejudicial result of counsel's alleged deficiency, the question for this Court is not whether the Appellate Division incorrectly applied <u>Strickland</u>'s prejudice prong to Kennedy's claim but whether it applied <u>Strickland</u>'s prejudice prong in an objectively unreasonable manner. <u>See</u> <u>Eze v. Senkowski</u>, 321 F.3d 110, 137 (2d Cir. 2003).

In affirming the trial court's denial of Kennedy's 440.10 Motion, the Appellate Division held that "[e]ven assuming that trial counsel's failure to request submission of manslaughter in the second degree or criminally negligent homicide as lesser included offenses was not a strategic choice, we find that counsel's omission did not deprive defendant of a fair trial or affect the outcome." <u>People v. Kennedy</u>, 7 A.D.3d 272 (N.Y. App. Div. 2004).  The court stated that the omission by Torres did not prejudice Kennedy because, as the Appellate Division had found on direct appeal, Kennedy's guilt had been established by "overwhelming" evidence at trial. <u>People v. Kennedy</u>, 7 A.D.3d at 272.  As a result, the court found that

-14-

"[t]here is no reason to believe that the jury would have convicted defendant of anything less than intentional murder no matter what lesser offenses had been submitted." Id.  Further, the Appellate Division noted that the jury convicted Kennedy of second degree murder and thereby rejected the option of convicting Kennedy of manslaughter. Id.  The court further observed that, under well-settled New York law, where a jury is given the choice of convicting for either second degree murder or first degree manslaughter, the jury's verdict of second degree murder renders harmless the trial court's refusal to instruct on the more "remote" lesser included offenses of second degree manslaughter or criminally negligent homicide, even if instruction on the lesser charges would have been proper.  Id.

        The Appellate Division did not unreasonably apply Strickland in concluding that Torres' failure to request a charge on the lesser included offenses did not affect the outcome of Kennedy's trial.  As the Appellate Division observed, the People presented overwhelming evidence of Kennedy's guilt of an intentional shooting.  The evidence established that Kennedy armed himself with a revolver that he knew to be loaded and ready to fire, followed Kedwar Ademuyina to the threshold of his apartment building, took aim at Mr. Ademuyina's back, and at a range of four feet fired the shot that killed Mr. Ademuyina.  The evidence further established that, prior to the killing, Kennedy

announced his intention to kill a non-gang member in order to
advance within the Bloods and that Kennedy had specifically
targeted Mr. Ademuyina as his victim.  Kennedy's intent was
further evidenced by the pains he undertook to ensure that his
assassination of a non-gang member comported with the code
established by the Bloods and would result in his promotion
within the Bloods, namely arranging with Brundage to provoke an
altercation with Mr. Ademuyina that would induce the requisite
"disrespect," and then using a gun loaded with only one bullet to
kill Mr. Ademuyina.  The letter that Kennedy sent to Brundage
after their arrests and incarceration, in which Kennedy boasted
of his promotion in the Bloods, provides further evidence that
Kennedy intended to murder Mr. Ademuyina in order to achieve
higher status in his gang.  This Court agrees with the Appellate
Division that the evidence of Kennedy's guilt of second degree
murder was overwhelming.

        Kennedy argues that "counsel failed to provide the jury
with a viable option if they believed the defense claim that this
shooting was accidental." (Pet. Mem. 21.)  Contrary to Kennedy's
argument, the jury did have an opportunity to return an
appropriate verdict in the event it determined that Kennedy did
not intentionally kill his victim.  The jury could have acquitted
Kennedy or found him guilty of the lesser offenses of either
manslaughter in the first degree or criminal possession of a

-16-

weapon in the second degree.  Instead, the jury convicted Kennedy
of the most serious of the charges, murder in the second degree.
In finding Kennedy guilty of second degree murder, the jury
clearly credited the People's testimony regarding the
intentionality of the shooting and rejected the arguments made by
Torres that the killing was accidental.  Given the verdict
returned by the jury, and the ample evidence of the
intentionality of the killing on which the verdict was based,
there is no reasonable proability that the jury's verdict would
have been different if Torres had requested, and the court had
agreed to submit to the jury, the lesser included charges of
second degree manslaughter and criminally negligent homicide.

        In sum, the Court finds that the Appellate Division was
not objectively unreasonable in concluding that Torres' failure
to request charges on the lesser included offenses did not affect
the outcome of Kennedy's trial.  Because I find that the alleged
error by Torres did not result in sufficient prejudice to
Kennedy, I need not consider whether Torres' omission amounted to
deficient performance.  Although there are two prongs to the
Strickland inquiry, "there is no reason for a court deciding an
ineffective assistance claim . . . to address both components of
the inquiry if the defendant makes an insufficient showing on
one. . . . If it is easier to dispose of an ineffectiveness claim
on the ground of lack of sufficient prejudice, which we expect

will often be so, that course should be followed." <u>Strickland</u>, 466 U.S. at 697; <u>accord, e.g.</u>, <u>Mallet v. Miller</u>, 432 F. Supp. 2d 366, 379 (S.D.N.Y. 2006); <u>Lugo v. Kuhlmann</u>, 68 F. Supp. 2d 347, 371 (S.D.N.Y. 1999); <u>Franza v. Stinson</u>, 58 F. Supp. 2d 124, 134 (S.D.N.Y. 1999).  Thus, because Kennedy has failed to satisfy the prejudice prong of <u>Strickland</u>, habeas relief must be denied.

CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of the Court is directed to close this case and remove it from the active docket of this Court.

SO ORDERED.

Dated:          New York, New York
                February 5 , 2007


                        JOHN F. KEENAN
                        United States District Judge

-18-